IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALVIN HARRIS,

    Plaintiff,

    v.

WEXFORD HEALTH SOURCES, INC.,
MAHBOOBEH MEMARSADEGHI,
M.D., ASHOK AGRAWAL, M.D., and
BON SECOURS HOSPITAL,[1]

    Defendants.

Civil Action No.: GLR-19-296

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Wexford Health Sources, Inc.

and Mahboobeh Memarsadeghi, M.D.'s (collectively, "Wexford Defendants") Motion to

Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 10); Defendant

Ashok Agrawal, M.D.'s Motion to Dismiss (ECF No. 17); Plaintiff Alvin Harris' Motion

to Appoint Counsel (ECF No. 19); Wexford Defendants' Motion to Strike Surreply (ECF

No. 24); and Harris' Motion for Leave to File Surreply (ECF No. 25). The Motions are ripe

for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the

reasons outlined below, the Court will grant Wexford Defendants' and Dr. Agrawal's

dispositive Motions; deny Harris' Motion to Appoint Counsel and Motion for Leave to File

Surreply; and deny as moot Wexford Defendants' Motion to Strike Surreply.

---

[1] The Court will direct the Clerk to amend the docket to reflect the names of
Defendants as they appear in the caption of this Memorandum Opinion.

# I.    BACKGROUND[2]

Plaintiff Alvin Harris is an inmate at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland. In general, Harris' Complaint concerns aftercare for a hemorrhoidectomy performed by general surgeon Dr. Ashok Agrawal at Bon Secours Hospital on February 8, 2018. (Compl. at 1, ECF No. 1; Supp. Compl. at 2, ECF No. 3). Harris alleges that he did not receive adequate attention from Dr. Memarsadeghi and other medical providers at RCI after his surgery despite his numerous complaints that "something was not done right" with regard to the procedure. (Compl. at 1; Supp. Compl. at 2). Harris also contends he had to undergo a second procedure on June 14, 2018 because Dr. Agrawal admitted he did not remove all of Harris' hemorrhoids during the February surgery. (Compl. at 1). The Court outlines Harris' relevant medical history in detail below.

## A.    Medical Record

Harris was seen by Dr. Agrawal on October 9, 2017 for an assessment of internal hemorrhoids that had been bleeding for several months and which had not responded to the use of hemorrhoid cream. (Wexford Defs.' Mot. Dismiss Ex. 1 ["Medical Records"] at 2, ECF No. 10-4; Aldana Aff. ¶¶ 1, 3, ECF No. 10-5). Harris received a colonoscopy to rule out any other source for the bleeding. (Medical Records at 2). The colonoscopy revealed multiple internal bleeding hemorrhoids, and a plan was developed to perform a

---

[2] Unless otherwise noted, the facts outlined here are set forth in Harris' Complaint (ECF No. 1) and Supplemental Complaint (ECF No. 3). To the extent the Court discusses facts that Harris does not allege in his Complaint and Supplemental Complaint, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

proctosigmoidoscopy[3] and a hemorrhoidectomy, which is the surgical removal of hemorrhoids. (Id.).

On December 21, 2017, Harris was seen by physician assistant Crystal Jamison at RCI in response to his inquiry about when he would receive the recommended surgery. (Medical Records at 3). Jamison noted that the consultation request for the surgery had been submitted, but Utilization Management had requested additional information. (Id.). Harris reported that he was using one tube of hemorrhoid ointment a week; that his hemorrhoids were so painful he had to lie on his side to alleviate the pain; that sitting longer than a few minutes caused pain; and his use of Anusol, dibucaine, and lactulose failed to improve his condition. (Id.). Jamison described the hemorrhoids as being "in a grape like cluster that [Harris] must manually return . . . to rectal vault." (Id.). Harris reported that "the entire toilet fills with blood on a regular basis." (Id.). Jamison submitted another consultation request for hemorrhoidectomy, which was approved on January 5, 2018. (Id. at 6).

On February 8, 2018, Harris underwent a proctosigmoidoscopy, hemorrhoidectomy, and anal fissurectomy[4] performed by Dr. Agrawal. (Id. at 9). Harris alleges that Dr.

---

[3] A proctosigmoidoscopy is an examination of the rectum and lower part of the colon through use of a thin, lighted instrument called a sigmoidoscope. See https://www.medicinenet.com/script/main/art.asp?articlekey=5056 (last visited Dec. 10, 2019).

[4] An anal fissure is a "small tear in the thin, moist tissue (mucosa) that lines the anus . . . [that] typically cause pain and bleeding with bowel movements." See https://www.mayoclinic.org/diseases-conditions/anal-fissure/symptoms-causes/syc-20351424 (last visited Dec. 10, 2019). Surgical treatment "involves cutting a small portion of the anal sphincter muscle to reduce spasm and pain, and promote healing." Id.

Agrawal told him he would be seen in one to two weeks after the surgery. (Compl. at 1). Following surgery, Harris was sent to the Jessup Regional Infirmary and was seen by physician assistant Matthew Carpenter. (Medical Records at 11–14). The post-operative treatment plan included pain medication, a stool softener, sitz baths three times per day and after each bowel movement, and a follow-up appointment in one week "with onsite surgery clinic." (Id. at 11). Harris was advised that the rectal dressing should be removed the following day and providers at RCI were notified to schedule a follow-up within four days of Harris' return. (Id.). To manage his post-surgical pain, Harris was prescribed Tylenol 3, which contains codeine, for three days and Tylenol 325-mg for one week. (Id.).

On February 9, 2018, Harris advised Nurse Addai that he had been unable to urinate after the surgery. (Id. at 15). In response to that report, physician assistant Esianor ordered placement of a catheter, enabling Harris to pass urine. (Id.). Harris' surgical dressing was removed and he was educated on how to perform a sitz bath. (Id.). Harris was returned to RCI and seen by Nurse Carder. (Id. at 16–17). Harris reported the surgical site was painful, but no bleeding or drainage or signs of infection were observed. (Id. at 16). He received a "general lay-in" order as well as feed-in status for four days. (Id.). He was also instructed again on use of the sitz bath, told not to engage in heavy lifting or yard activity, and excused from work assignment. (Id.). Harris again advised he had not voided his bladder since being catharized earlier that day. Dr. Memarsadeghi called Dr. Agrawal to report that Harris had been unable to urinate. (Id. at 18). Dr. Agrawal recommended that Harris receive a Foley catheter for forty-eight hours and asked to be notified if Harris still could not urinate on his

4

own. (Id.). On February 12, 2018, after the catheter was removed, Harris reported voiding well without pain or blood in his urine. (Id. at 21).

On February 14, 2018, Harris saw Dr. Memarsadeghi and, according to the record, reported the pain was improving. Harris was continued on stool softener and was in no apparent distress. (Id. at 27–28). Harris claims that Dr. Memarsadeghi did not examine the surgical site during his visit on February 14, 2018. (Pl.'s Opp'n Mot. Dismiss ["Opp'n"] at 3, ECF No. 20). Later that evening, Harris was transported to the dispensary on a stretcher due to severe pain caused by a medium-loose bowel movement with bloody discharge. (Id.; Medical Records at 29–31). Harris' medical records indicate he had a light pink drainage visible at the time and that he was advised to increase his water intake. (Medical Records at 29–31). Harris claims "Nurse Mary-Ellen . . . took dirty gauze out of Harris's rectum, took a look at Harris, and put the very same dirty gauze back into Harris's rectum, and returned Harris back to the cell, over [his] objection." (Opp'n at 3). Harris also claims he could not walk back to the cell on his own and the correctional officers put him back onto the stretcher to carry him to his cell. (Id.).

On February 20, 2018, Harris submitted a sick call slip stating "something is not right" since having the hemorrhoidectomy. (Medical Records at 32). He was seen the following day by Nurse Carder, to whom he reported leaking pink fluid and experiencing pain on the right side of his anus. (Id. at 33). Carder noted no visible signs or symptoms of an infection, and saw no drainage or open areas, redness, or swelling. (Id.). Harris was referred to a provider to discuss the issues he was experiencing. (Id.).

On February 23, 2018, Harris was seen by Dr. Memarsadeghi at the chronic care clinic, but the record of the visit states he gave no indication that he experienced post-operative complications. (Id. at 36–38). Rather, according to Dr. Memarsadeghi's account, Harris reported he did not have blood in his stool, constipation, or rectal bleeding, and further advised that the pain was improving. (Id.). Harris was provided with renewed orders for hemorrhoid ointment and stool softener. (Id.). Harris claims, however, that when he saw Dr. Memarsadeghi on February 23, 2018, he explained to her that he was in "extreme pain, and that something was extremely wrong with [his] rectum." (Opp'n at 3). Harris also claims he told Dr. Memarsadeghi that he was bleeding, but she refused to examine him and had no response when Harris said he was supposed to be seen by the surgeon for a follow-up appointment.[5] (Id. at 4).

On March 9, 2018, Harris complained to Nurse Lourdon about an exacerbation of symptoms similar to those he experienced before his surgery. (Id. at 4; Medical Records at 40). Harris explained he needed to see Dr. Memarsadeghi or physician assistant Jamison for post-operative care. (Medical Records at 40). Harris reported that he had been attempting to see Dr. Agrawal, but his sick call slips merely resulted in a screening with a nurse. (Id.). Harris described experiencing pain on the right side of his anus beginning five minutes after a bowel movement accompanied by bright red bleeding. (Id.). At the time, Harris was using stool softeners, hemorrhoidal cream, and a donut when sitting. (Id.). The

---

[5] Dr. Memarsadeghi does not provide an affidavit in support of her Motion and does not otherwise deny this assertion. The medical record for Harris' February 23, 2018 chronic care visit seems to suggest that Dr. Memarsadeghi did not examine Harris for the symptoms he reported related to his surgery. (Medical Records at 36–38).

notes for the visit indicate that Harris was "educated [regarding] plan to have a provider see him for this issue." (Id.). The notes do not document the details of the plan for Harris to see a provider. (See id.).

On March 16, 2018, according to a sick call slip, Harris had not been seen by a provider and had not received a follow-up appointment for his surgery. (Id. at 42). Harris explained he was "having problems and still bleeding" and said, "something is wrong, I'm having very bad pains as well." (Id.). Harris also stated that he "was told last Friday by [Lourdon] that she couldn't put me in to see that doctor who did the operation, but she could put me in to see a doctor here," but he had not yet been seen by a doctor at RCI. (Id.). The sick call slip appears to have been signed by Dr. Memarsadeghi on March 20, 2018, with no indication that any action was taken in response to Harris' complaint. (Id.).

On March 18, 2018, Harris was seen by Nurse Carder for his complaint of rectal pain, which he described as "bad pain" that he could not tolerate. (Id. at 43). Harris claims an officer sent him to the dispensary because he was in extreme pain. (Opp'n at 4). Carder's exam revealed "possible small hemorrhoid or scar tissue noted near anus, no active bleeding, no redness, no [signs or symptoms] of infection." (Medical Records at 43). Carder reviewed Harris' records and wrote the following narrative:

> It is noted that pt returned from surgery on 2-8-18. From EPHR, he was seen by nursing on 2-9 and 2-11. He saw the provider 2-14 as post off site encounter with plan to follow up in 30 days if no improvement. He was then seen by nursing 2-14 and 2-21 with a referral placed for this pain issue. He was seen 2-23 for his [chronic care] appt and there is no mention of his post op issue in that note. He was seen again 3-9 by nursing and a referral was placed at that time and then he is seen again today. He is still having the same complaint. No referral placed at this time related [illegible] . . . Will send email to medical records/scheduling to request pt

be seen by provider as he has had no improvement as per plan by the provider when seen 2-14.

Pt educated that a referral has already been placed and that he will be scheduled as per protocol. Pt also educated to continue to follow current treatment plan until he is seen by a provider to discuss other treatment options.

(Id. at 43–44). Following this appointment, Harris states he began submitting requests directly to Dr. Memarsadeghi but received no response from her. (Opp'n at 5).

On March 22, 2018, physician assistant Jamison saw Harris for his complaints regarding continued pain following his surgery. (Medical Records at 47). Jamison submitted a consultation request for a follow-up visit with general surgery to address Harris' complaints. (Id.). That consultation request was approved on March 28, 2018. (Id. at 50).

On April 6, 2018, Harris submitted a sick call slip indicating that the consultation had not taken place and that "all I'm doing is going through pain over and over and nothing seems to be getting done and I'm suffering." (Id. at 51). The provider signature on the sick call slip, which appears to be the signature of Dr. Memarsadeghi, is dated April 10, 2018; no other remarks are made on the sick call slip from medical staff. (Id.).

On April 9, 2018, Harris had a recurrence of hemorrhoids with bleeding and was unable to sit despite use of sitz baths and an inflatable donut. (Id. at 52). A rectal exam was described as "painful with sphincteric spasm" and revealed an anal fissure. (Id.). Harris was diagnosed with "recurrent hemorrhoids and anal fissure" and was recommended to receive a second hemorrhoidectomy. (Id.). The following day, Nurse Lewis wrote a referral for onsite general surgery. (Id. at 53).

8

Physician assistant Jamison saw Harris for the general surgery consultation on April 26, 2018. (Id. at 54). Harris told Jamison that the pain he was experiencing made walking and sitting difficult and that "lying down is the only position that is able to tolerate pain." (Id.). Jamison noted that the April 9, 2018 follow-up appointment resulted in a recommendation for "sigmoidoscopy, fissurectomy and hemorrhoidectomy." (Id.). Jamison wrote a consultation request for general surgery with Dr. Agrawal, which was approved on May 2, 2018. (Id. at 56–57). Harris claims that his complaints of continued bleeding and extreme pain went unaddressed by Dr. Memarsadeghi, despite seeing her regularly for chronic care clinic. (Id.).

On May 10, 2018, Harris was seen by Nurse Carder to address his concerns about the referral for surgery. (Id. at 58). Harris was told that he had been approved for a surgery consult and "that he needs to be patient while awaiting the app[ointment]t." (Id.).

On May 23, 2018, Harris was seen by Dr. Memarsadeghi for a chronic care visit. (Id. at 60–62). Dr. Memarsadeghi did not make any new notations regarding Harris' surgery and referred only to "notes from one month earlier" regarding the plan. (Id. at 60).

On May 29, 2018, Harris received a pre-operative evaluation performed by Jamison. (Id. at 63). Harris received the second surgery on June 14, 2018. (Id. at 67–72). Harris was discharged from the hospital on the same day. (Id. at 73–81). Following his discharge from the hospital, Harris was sent to the Jessup Regional Infirmary, where he was seen post-operatively by physician assistant Giangrandi. (Id. at 83). Giangrandi noted that Harris was to begin taking Tylenol-3 that day and follow up with the surgery clinic at "DOC facility" in one week. (Id.; Opp'n at 6). The surgical packing was to be removed the following

morning and Harris was instructed to do sitz baths three times a day and after each bowel movement. (Medical Records at 83). Harris was sent to a housing unit at Jessup Correctional Institution that evening. (Id.).

Harris alleges that he returned to Jessup Regional Infirmary six hours after his release because he could not urinate on his own and the surgical packing needed to be removed. (Opp'n at 6). Harris states he was told by medical staff that the surgical dressings would not be changed until 3:00 p.m. (Id.). Harris asserts that his doctor's orders to have the dressings changed on the morning after his surgery were simply ignored and, as a result, the surgical packing became uncomfortable. (Id.).

Harris was transferred back to RCI without the packing being removed, a trip he describes as painful. (Id.). Upon his return to RCI, Nurse Domalik described Harris as "walking slowly and sitting on donut while . . . in the dispensary." (Medical Records at 85). Harris reported that "the anal packing is hanging out of his rectum and he told them at [Jessup Regional Infirmary] that it was to come out this [morning] per MD order, but they never removed it." (Id.). Domalik removed the packing and noted that Harris was "very uncomfortable and in pain" while it was removed. (Id.). At that time, Harris was not receiving Tylenol-3 as ordered and declined to take regular Tylenol. (Id.). Domalik attempted to contact the on-call physician about Harris' order for Tylenol-3 but was unsuccessful. (Id.). Domalik noted she would "await in-house provider to attempt to get pain med orders and possible feed-in status." (Id.).

Later that day, Harris reported back to the RCI dispensary with complaints of increased pain, which he rated a nine on a scale of ten. (Id. at 88). Harris was "doubled

over in pain with 2 officers assist[ing] pt to ambulate into dispensary." (Id.). Nurse Weinberg examined Harris and called the on-call physician, Dr. Chaudry, to notify him of Harris' condition. (Id.). Dr. Chaudry prescribed Harris two tablets of Tylenol-3 twice a day for ten days. (Id.). Weinberg gave Harris two tablets for his evening dose while Harris was in the dispensary. (Id.). Harris states his requests for pain medication had been ignored until this time. (Opp'n at 6). Even after receiving pain medication, Harris states that between June 16, 2018 and June 20, 2018, he experienced "bleeding and drainage" with each bowel movement and pain that was not alleviated by sitz baths. (Id.).

On July 5, 2018, Harris was seen by physician assistant Jamison and reported that the pain following his surgery had subsided and that he had no complaints. (Medical Records at 90). Jamison's physical exam of Harris noted a "small protruding hemorrhoid at approx[imately] 7 o'clock." (Id.).

On August 3, 2018, Harris again complained of recurrent pain. (Id. at 92). Harris was scheduled to be seen in the dispensary, but his appointment was cancelled due to a medical emergency involving another inmate. (Id.).

On August 22, 2018, Harris returned with complaints of rectal bleeding and pain that had not subsided since his last surgery. (Id. at 93). Harris expressed frustration that he had not been called back up after his appointment was cancelled on August 3, 2018. (Id.). Harris denied having constipation or straining when defecating. (Id.). Domalik offered to examine Harris, but he declined; she noted Harris was "[s]itting in [a] chair in sick call with no signs of discomfort." (Id.). Domalik also noted that Harris had a chronic care

appointment the following day and that he could address the issues regarding pain and rectal bleeding with the provider at that time. (Id.).

On August 23, 2018, Harris was seen by nurse practitioner Munjanja Litell. (Id. at 95). Harris explained to Litell that he had initially experienced improvement in his symptoms following the June 14, 2018 surgery, but his symptoms had returned. (Id.). Harris also reported he was "using four hemorrhoid cream containers a month." (Id.). Harris declined a rectal exam, but stated he wanted to have a "follow up appointment with surgical to evaluate post surgical healing." (Id.). Litell noted that Harris should continue using hemorrhoid cream but did not note a referral for the post-surgical evaluation Harris requested. (Id. at 95–97).

On September 20, 2018, Harris notified Nurse Diaz that the order for his hemorrhoidal ointment was not refilled correctly. (Id. at 98). Harris was prescribed four tubes a month, but the order was placed for only four tubes in total. (Id.). Diaz contacted Dr. Memarsadeghi and asked her to review and resubmit the order. (Id.). Five days later, Harris reported back to sick call that he still had not received the ointment. (Id. at 100). Diaz called Correct Rx and was informed that they did not have an order for the ointment. (Id.).

On December 3, 2018, Harris was seen in chronic care by physician assistant Jamison. (Id. at 103). Jamison made the following notation regarding Harris' hemorrhoids:

> Two surgical procedures for chronic hemorrhoids this year patient states that he does not feel any improvement since the surgery. Duration: >1 hour. Severity: severe. Location was perianal. The patient describes it as burning, gnawing, sharp and stabbing. It occurs daily. The problem has improved. Context: no pattern noted and straining at BM. Risk factors

include age > 45, chronic constipation, previous hemorrhoid surgery, previous thrombosed hemorrhoids, prolonged toilet time (ex. reading) and sedentary occupation. Treatment/Diagnostics are Hydrocortisone. Symptom is aggravated by bowel movements and straining at stool. There are no relieving factors.

(Id.).

On March 11, 2019, Dr. Choudry saw Harris for chronic care and noted that the hemorrhoids were "improving." (Id. at 109). As of March 15, 2019, the date Harris filed his Supplemental Complaint, Harris had not received an aftercare appointment with Dr. Agrawal for the second procedure. (Compl. at 1; see also Supp. Compl. at 2).

## B.    Procedural History

On January 30, 2019, Harris filed a Complaint pursuant to 42 U.S.C. § 1983 (2018). (ECF No. 1). On March 15, 2019, Harris filed a Supplemental Complaint naming as Defendants: Wexford Health Sources, Inc., Mahboobeh Memarsadeghi, M.D., Ashok Agrawal, M.D., and Bon Secours Hospital. (ECF No. 3). On May 16, 2019, this Court issued an Order construing Harris' allegations against Dr. Agrawal as "state-law medical negligence claims" rather than federal constitutional claims, finding that the "allegations against Dr. Agrawal do not rise to the level of deliberate indifference." (May 16, 2019 Order at 4, ECF No. 13). Taken together, Harris' Complaint and Supplemental Complaint generally allege violation of his rights under the Eighth Amendment of the United States Constitution by Wexford Defendants and state-law medical negligence against Dr. Agrawal. (Compl. at 1–2; Supp. Compl. at 2). Harris seeks $1.1 million in compensatory damages, unspecified punitive damages, and injunctive relief. (Supp. Compl. at 3).

Wexford Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on April 15, 2019, (ECF No. 10), and Dr. Agrawal filed a Motion to Dismiss on June 17, 2019, (ECF No. 17). Harris filed an Opposition to both Motions on June 26, 2019. (ECF No. 20). Wexford Defendants filed a Reply on July 1, 2019, (ECF No. 21), followed by Agrawal's Reply on July 11, 2019, (ECF No. 22).

## II.    DISCUSSION

### A.    Harris' Motion to Appoint Counsel

Harris filed a Motion to Appoint Counsel on June 26, 2019. (ECF No. 19). A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. See Cook v. Bounds, 518 F.2d 779, 780 (4th Cir. 1975); see also Branch v. Cole, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." See Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Ct., 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Exceptional circumstances include a litigant who "is barely able to read or write," Whisenant, 739 F.2d at 162, or clearly "has a colorable claim but lacks the capacity to present it," Berry v. Gutierrez, 587 F.Supp.2d 717, 723 (E.D. Va. 2008).

Upon careful consideration of the motions and previous filings by Harris, the Court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. No exceptional circumstances exist that warrant the appointment of an attorney to represent Harris under § 1915(e)(1). Accordingly, the Court will deny Harris' Motion to Appoint Counsel.

## B. Harris' Surreply

On July 17, 2019, Harris filed a Surreply to Agrawal's Motion to Dismiss. (ECF No. 23).[6] The following day, Wexford Defendants filed a Motion to Strike Surreply. (ECF No. 24). On July 31, 2019, Harris filed a Motion for Leave to File Surreply. (ECF No. 25).

"Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed." Local Rule 105.2(a) (D.Md. 2018). Typically, "[s]urreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing Lewis v. Rumsfeld, 154 F.Supp.2d 56, 61 (D.D.C. 2001)).

Harris argues his Surreply is warranted to clarify that his claims against Agrawal are constitutional claims, not claims for medical negligence. Further, Harris contends he is not aware of any Order by this Court stating that the claims in his Complaint and supplemental filing do not rise to the level of deliberate indifference. However, Harris should have been aware of the Court's Order construing Harris' allegations as state-law

---

[6] Because Harris filed his Surreply before seeking leave of the Court to do so, the Clerk marked Harris' Surreply as "Filed in Error" and disabled the link to the document in the Court's Case Management/Electronic Court Filing ("CM/ECF") system. Accordingly, the Court will deny Wexford Defendants' Motion to Strike Surreply as moot.

medical negligence claims, as the Court directed the Clerk to mail Harris a copy of the Order. (May 16, 2019 Order at 4). And more importantly, Harris could have addressed this issue and responded to Dr. Agrawal's arguments for dismissal in his Opposition instead of a Surreply. As such, the Court will deny Harris' Motion for Leave to File Surreply and deny as moot Wexford Defendants' Motion to Strike Surreply.

## C.    Dr. Agrawal's Motion to Dismiss

### 1.    Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d

445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd sub nom.</u> <u>Goss v. Bank of Am., NA</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994); <u>Lambeth v. Bd. of Comm'rs</u>, 407 F.3d 266, 268 (4th Cir. 2005) (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, <u>Iqbal</u>, 556 U.S. at 678.

Pro se pleadings are liberally construed and held to a less stringent standard than pleadings drafted by lawyers. <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)). Nonetheless, "[w]hile pro se complaints may 'represent the work of an untutored hand requiring special judicial solicitude,' a district court is not required to recognize 'obscure or extravagant claims defying the most concerted efforts to unravel them.'" <u>Weller v. Dep't of Soc. Servs. for Balt.</u>, 901 F.2d 387, 391 (4th Cir. 1990) (quoting <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274, 1277 (4th Cir. 1985)). Further, "[t]he Court cannot act as a <u>pro se</u> litigant's 'advocate and develop, <u>sua sponte</u>, statutory and constitutional claims' that the litigant failed to raise on the face of the complaint." <u>Branch v. Machen</u>, No. 3:14CV708, 2014 WL 6685497, at *2 (E.D.Va. Nov. 25, 2014) (quoting <u>Newkirk v. Circuit Court of Hampton</u>, No. 3:14cv372–HEH, 2014 WL 4072212, at *1 (E.D.Va. Aug. 14, 2014)).

## 2. Analysis

Dr. Agrawal argues that dismissal is proper because Harris failed to comply with certain mandatory conditions prior to bringing a claim for medical negligence or medical malpractice in Maryland. The Court agrees.

Under Maryland law, a plaintiff in a medical malpractice action must file a Statement of Claim and a Certificate of Qualified Expert in the Health Claims Alternative Dispute Resolution Office ("HCADRO") of Maryland as a condition precedent to proceeding with the claim in court. The certificate of a qualified expert must attest to the defendant's departure from the applicable standard of care and that defendant proximately caused plaintiff's injury. See Md. Code Ann., Cts. & Jud. Proc. ["CJP"] § 3-2A-04(b)(1). A claimant must also exhaust a state arbitration process as a precondition to bringing a civil action on the claim in state or federal court. See § 3-2A-02; Rowland v. Patterson, 882 F.2d 97, 97 (4th Cir. 1989). This pre-suit filing requirement applies to claims sounding in medical negligence seeking damages in an amount that invokes the jurisdiction of the state circuit courts, including cases filed in federal court.[7] CJP § 3-2A-02(a)(1); see Davison v. Sinai Hospital of Balt. Inc., 462 F.Supp. 778, 779–81 (D.Md. 1978), aff'd, 617 F.2d 361 (4th Cir. 1980). A malpractice action must be dismissed if a plaintiff does not comply with these requirements.

---

[7] Maryland circuit courts have exclusive original jurisdiction in tort or contract cases for money damages where the amount in controversy exceeds $30,000. CJP § 4-401(1). Harris seeks $1.1 million in monetary damages from Defendants but does not delineate the portion of damages attributable to Dr. Agrawal individually. Nonetheless, given the extent of Harris' alleged damages, the Court will presume that his claim against Dr. Agrawal exceeds the $30,000 amount-in-controversy requirement.

Because the Court construes Harris' claims against Dr. Agrawal as claims of medical negligence or malpractice, they are subject to the filing requirements under Maryland law. Harris does not deny failing to comply with these prerequisites; thus, his claims against Dr. Agrawal will be dismissed without prejudice.[8]

## D.   **Wexford Defendants' Motion**

### 1.   **Conversion**

Wexford Defendants' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." Bosiger v. U.S. Airways, 510 F.3d 442, 450 (4th Cir. 2007). Pursuant to Rule 12(d), however, a court has the discretion to consider matters outside of the pleadings in conjunction with a Rule 12(b)(6) motion. If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d).

---

[8] Defendant Bon Secours Hospital ("Bon Secours") was served on May 21, 2019, making its response to Harris' Complaint due on or before June 11, 2019. (ECF No. 15). To date, the Court has no record of a response by Bon Secours. Nonetheless, because Harris' claims against Bon Secours are premised solely on Dr. Agrawal's conduct, the Court will also dismiss Bon Secours from suit.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." Id. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. Id. at 165–67. "When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion in accordance with the standard set forth in Rule 56, the district court is likely to accept it." Id. at 165. In contrast, when the extraneous material is "scanty, incomplete, or inconclusive, the district court probably will reject it." Id. at 165–66.

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998). In this case, Harris was notified, pursuant to the dictates of Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of his obligation to present evidentiary material in response to Wexford Defendants' Motion. (See Rule 12/56 Letter, ECF No. 11). Moreover, Wexford Defendants expressly captioned their Motion "in the alternative" as one for summary judgment, and submitted matters outside the pleadings for the court's consideration. In that circumstance, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not

have an obligation to notify parties of the obvious." <u>Laughlin</u>, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); <u>see</u> <u>Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.</u>, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); <u>Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.</u>, Civ. No. JFM–10–0206, 2010 WL 2732334, at *3 (D.Md. July 8, 2010). Accordingly, the Court will construe Wexford Defendants' Motion as one for summary judgment.

## 2. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be

made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Id. Further, if the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

### 3. Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976); <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 737 (2002); <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>King v. Rubenstein</u>, 825 F.3d 206, 218 (4th Cir. 2016). The United States Supreme Court has recognized that denial of medical care may constitute cruel and unusual punishment. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>see also</u> <u>Anderson v. Kingsley</u>, 877 F.3d 539, 543 (4th Cir. 2017). A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834–37 (1994); <u>see also</u> <u>Heyer v. U.S. Bureau of Prisons</u>, 849 F.3d 202, 209–10 (4th Cir. 2017); <u>King</u>, 825 F.3d at 218; <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992) (holding there is no expectation that prisoners will be provided with unqualified access to health care); <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction

of pain when it is not treated properly. See e.g., Barnes v. Bilak, No. JKB-17-1057, 2018 WL 2289232, at *6 (D.Md. May 17, 2018) (noting that high blood pressure is a serious medical need); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (finding that pituitary tumor is a serious medical need); Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (finding that risk of suicide is a serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendants knew about the problem. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (quoting Farmer, 511 U.S. at 842).

Reasonableness of the actions taken must be judged in light of the risk to the inmate that the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (finding that physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements

between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

Where, as here, a physician recognizes that a medical condition requires surgery, or other treatment, the condition is one that is "serious" for the purposes of an Eighth Amendment claim. Wexford Defendants assert, however, that the care provided to Harris comports with their obligation under the Eighth Amendment's prohibition against cruel and unusual punishment. For his part, Harris disputes Wexford Defendants' claim that his hemorrhoids re-occurred, necessitating a second surgical correction, and maintains this characterization is simply a ruse to hide the incompetence of the surgeon. For the reasons outlined below, the Court agrees with Wexford Defendants.

Wexford Defendants provide ample evidence that their treatment of Harris does not constitute a callous disregard for his well-being. Wexford Defendants first treated Harris' condition conservatively and, when his hemorrhoids failed to respond to those treatments, Harris was referred to Dr. Agrawal for surgery. In the months after the surgery, Wexford Defendants treated Harris with pain medication, stool softener, hemorrhoid ointment, sitz baths, and a catheter when Harris was unable to urinate. Wexford Defendants routinely met with Harris in response to his sick call slips complaining that something was amiss

following his procedure. Although Harris initially reported that his pain was improving, Wexford Defendants performed multiple rectal exams and promptly referred Harris to a follow-up visit with general surgery when Harris' pain began to worsen. And although Harris contends there was a delay in receiving pain medicine and removal of the packing following his second surgery, Wexford Defendants resolved both issues within hours of learning of the problems. Overall, there is no evidence of unnecessary delay in addressing Harris' complaints of pain, nor is there any evidence that Wexford Defendants' actions rise to the level of deliberate indifference to Harris' condition.

Harris also asserts that prison staff disobeyed Dr. Agrawal's post-operation instructions by failing to take him back to see the surgeon for aftercare. Although the Court recognizes this may be an understandable source of frustration, evidence in the record shows that Wexford Defendants' failure to follow Dr. Agrawal's precise directives does not rise to the level of an Eighth Amendment violation. First, a one- to two-week surgical follow-up "in normal civilian life [is] predicated on the assumption that the physician performing a given procedure would be the necessary health care provider to follow up on any given procedure." (Aldana Aff. ¶ 12, ECF No. 10-5). Those instructions, however, do not account for the intricacies involved with transporting and scheduling inmates for an outside appointment. (Id.). Second, follow-up care after surgery on a person who is incarcerated need not involve transportation to an offsite provider. (Id.). In lieu of bringing the inmate back to the surgeon who performed the surgery for a follow-up appointment, "on call physicians and mid-level providers" who are available at the prisons "can be scheduled to perform timely follow-up evaluations." (Id.). "These physicians and mid-level

providers are competent to provide routine monitoring of a patient's healing process following routine surgical procedures." (Id.). Wexford Defendants also submit evidence that "to a reasonable degree of medical probability, [Harris] had appropriate surgical follow up care while at RCI." (Id. ¶ 5, 12). Simply put, Wexford Defendants are not constitutionally required to arrange for a post-surgical inmate to travel off-site to see the surgeon who performed the procedure when there are medically trained professionals available at the inmate's detention facility to provide adequate care. Thus, Wexford Defendants' failure to take Harris back to Dr. Agrawal for post-surgery examination does not support an Eighth Amendment claim.

Finally, Harris argues that his second surgery was performed to hide the incompetence of Dr. Agrawal, apparently assuming that the need for a second surgery implies his first surgery or the resulting aftercare were substandard. This assertion is not supported by any clinical evidence in Harris' case. Rather, "recurrent hemorrhoids are a common medical condition" and Harris "has many of the risk factors which increase the likelihood for recurrence given his age and medical history." (Aldana Aff. ¶ 11). Thus, that Harris had to undergo a second surgery does not give rise to an inference that his first surgery was performed incorrectly or somehow violated his Eighth Amendment rights.

### III. CONCLUSION

For the foregoing reasons, Wexford Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 10), construed as a motion for summary judgment, is GRANTED; Dr. Agrawal's Motion to Dismiss (ECF No. 17) is GRANTED; Harris' Motion to Appoint Counsel (ECF No. 19) is DENIED; Wexford

Defendants' Motion to Strike (ECF No. 24) is DENIED AS MOOT; and Harris' Motion for Leave to File Surreply (ECF No. 25) is DENIED. The Court will direct the Clerk to CLOSE the case. A separate Order follows.

Entered this 20th day of February, 2020.

_____/s/_____
George L. Russell, III
United States District Judge